## NIEMCZEWSKI v. UNITED STATES.

District Court, D. Maine, S. D.

Feb. 2, 1932.

Eugene F. Martin and Edward S. Anthoine, both of Portland, Me., for petitioner.

William J. Hession, of Boston, Mass., for the United States.

PETERS, District Judge.

This is an action on a war risk insurance policy. A jury having been waived, it is incumbent upon me to decide whether the plaintiff suffered total permanent disability on or before December 31, 1918, the only question in the case. The cause of the alleged disability is claimed by the petitioner to be pulmonary tuberculosis.

It would serve no useful purpose to reiterate the definitions, rules, and presumptions governing the decision in such cases. They are laid down for this circuit with clarity in the Ford Case (C. C. A.) 44 F.(2d) 754.

I find that the plaintiff, a baker by trade, entered the military service of the United States September 4, 1918, and was sent to Camp Upton for training. He was discharged December 3, 1918, as in "good" physical condition. In the middle of December, 1918, he went to work at his former job in a bakery and continued working there the remainder of 1918, all of 1919, except eight days' lost time, two of which were on the occasion of his marriage, all of 1920, with one week out in September, and until October, 1921, with again a week out in September and four other days at intervals earlier in the year. During this period his wages were increased from time to time to $30 per week.

The evidence as to the plaintiff's physical condition from September 4, 1918, to December, 1919, when he first consulted a doctor after his discharge, comes wholly from himself and his associates. It should be borne in mind that the extent of the plaintiff's disability on or before December 31, 1918, the date of the lapse of the policy, is the matter in controversy. Evidence of this subsequent condition is useful only to throw light on the previous situation.

The plaintiff, testifying, says: He felt all right before entering the army. At camp, while on a long hike, he felt ill and tired and had difficulty in keeping up with the others. He took a shower bath while hot. Was excused from duty and went to bed. Coughed and raised somewhat. Felt worse the next day, and tired. Bed wet with sweat. Company doctor did not examine him, but gave him pills, "and from that time I feel worse every day during the time of the flu." Asked how he felt up to the time of his discharge, he replied: "I feel quite mean, but not mean to stay in bed. But I wasn't feeling like I could do anything, but if I get orders to do things I went and do it." Excused from duty two or three times and went to bed. Losing weight and felt weak and debilitated.

As to the two weeks after his discharge and before beginning work at the bakery, the plaintiff described his condition thus: "I feel pretty fair at that time. I take a rest. Of course I didn't know whether I was sick or not, but I feel mean all the time. I was kind of cold and coughed."

After returning to the bakery, "After a while I was in pain and increasing coughing. * * * I feel tired and sweat a lot and had kind of fainting spells." He was given an easier job in the bakery. It does not appear, however, whether this was during the critical period (before 1919) or later during the two or three years that he worked in the bakery.

One of his employers in the bakery testified that he was not really able to work and should not have worked; that he was inefficient and incapable of working, and kept on the pay roll partly from sympathy; but, as to this, it is not certain that reference was made to any part of 1918. On cross-examination the witness was asked:

"Q. Wasn't that in 1922? A. To be perfectly honest, I couldn't tell you.

"Q. Wasn't that about the time he had to give up work altogether? A. I should say so."

He gave up work altogether in the spring of 1922, or possibly it could be called the fall of 1921, when he went to the hospital with rheumatic fever.

Companions in the bakery testified to the plaintiff's complaining of feeling tired and that he seemed not to be able to work without effort. Fellow soldiers at Camp Upton corroborated the testimony of the plaintiff as to his condition while there, including perspiring to the extent that the blankets were wet in the morning, and as to his complaints of being tired, his coughing, and general weakness.

The above summary represents all the direct testimony as to the plaintiff's physical condition on or before December 31, 1918.

The plaintiff's subsequent history comprises his work in the bakery as stated, with the brief interruptions mentioned (which he ascribes to illness and the same feeling of lassitude and weakness previously mentioned by him) until September, 1921, when he was attacked with rheumatism. He went to the hospital for some months. He left there, had the grippe, and worked about a month in the bakery in March, 1922, when he gave up that work finally.

On May 2, 1922, he applied for compensation and vocational training. The following appears in his application:

"11.—Nature of disability claimed. Rheumatism. Degree of disability. Unable to work.

"12.—Date disability began. September, 1918.

"13.—Cause of disability. Hiking and exposure.

"14.—Where received. Camp Upton, New York."

The plaintiff says he was not well versed in the English language, but did not deny that he gave these answers.

Plaintiff was in a government sanitarium from June, 1922, to March, 1924, and also in other government hospitals for tuberculosis patients after that. He is now living in the country, but cannot work without getting overtired. He is apparently unable to work or earn money at the present time.

Turning now to the medical testimony: The first doctor consulted by the plaintiff after his discharge from the army was a general practitioner who examined him in December, 1919, a year after his discharge and after he had worked in the bakery a year. Occasional treatments by this doctor continued for a year and a half. He had no notes, relying upon his memory. He said that he found a dullness in the top of the right lung of the plaintiff; some crepitant rales, and inflammation of the pleura; debility; pain; mucous membranes of the throat and tonsils involved. "It looked like an incipient tuberculosis" to him. Later he said, "I made a diagnosis of an incipient condition which would produce tuberculosis, but tuberculosis in a limited degree already existed." He gave no opinion as to the condition of the patient in this respect the year before, which is the time we are especially concerned with.

Dr. Nichols, a specialist in diseases of the chest, examined the plaintiff for the first time in May, 1922, having been asked to do so by the Veterans' Bureau. Dr. Nichols said: "At that time I found that he was subjectively complaining of fatigue, shortness of breath, coughing and expectorating and loss of strength. I examined him and at that time I didn't make a conclusive diagnosis. It was undetermined; with the suggestion that he be examined again in a few months time. I examined him again in June and found that his condition hadn't improved; in fact, I didn't think it was as good. He had then characteristic rales which were persistent,

which led me to believe that he had an active tuberculosis condition. He also complained of pains in the joints which I think there was some swelling of the joints. There was a soft systolic heart murmer. That wasn't very loud, and I thought it was one of the complicating conditions. I then recommended that he be treated for tuberculosis. * * * My prognosis at that time was 'Good under proper treatment.' "

The doctor found at that time that plaintiff had three diseases, mild endocarditis, tuberculosis, and rheumatism. He said that the patient had no resistance and in his judgment could not earn a "gainful living." He further gave the opinion that plaintiff had had tuberculosis since December, 1918, and perhaps longer. Afterwards the doctor said that he did not think the tubercular bacillus was present in the plaintiff in 1918, that his condition was indeterminate in 1922, and that in that year he found no breaking down of the lung tissue.

This doctor recommended hospitalization, and the patient was apparently treated for tuberculosis from 1922 to 1924, and again in 1927, and also in a Washington hospital for tuberculosis.

Dr. Cummings, a specialist in X-ray diagnosis and treatment, testified for the plaintiff. He examined him August 30, 1922. He described some conditions in the chest which he said were suggestive of active tuberculosis. At the request of the Veterans' Bureau he examined the patient again in January, 1925. He described the conditions he found, and says they "showed no evidence of active tuberculosis." He examined the patient again February 1, 1931, as a private patient, and said: "The findings were practically the same as in the last one. I can repeat them, but they are practically the same. There wasn't any evidence of active tuberculosis, so far as you can tell."

Dr. Anderson, a practicing physician and surgeon, called by the plaintiff, saw him in 1920, but the first records of his condition are in 1921. When he first saw the patient he noticed extreme exhaustion and that he fatigued easily and carried a low blood pressure. He advised him that he was unable to work. Believes he examined the patient's lungs in the early part of 1920 by means of a stethescope. "I was unable to pick up any different signs at that time; perhaps an irritation of the trachea, or windpipe, was about the only thing I could pick up by auscultation, but I was suspicious of a tubercular condition of his lungs." He made

other examinations, and later, in 1921, made a diagnosis of pulmonary tuberculosis, which condition he believes consistent with a tuberculosis of long standing. "I believe that he had a latent tuberculosis that gradually developed and would be aggravated or increased in its intensity by some intercurrent disease. Q. And would such a condition as you found in 1921 be consistent with tuberculosis in December, 1918? A. I believe that it is probable." The doctor thought he was able to work at no time since 1920.

The plaintiff was in the Maine General Hospital from October 15, 1921, to December 3, 1921, and the records of the hospital, supplemented by the testimony of the physicians, show a diagnosis of rheumatic fever with swelling and pain in joints. "Patient remembers no previous diseases. Had rheumatism at 13 and 25 years of age. History shows a case of rheumatism with symptoms extending back over the summer." Was discharged as cured. The doctors, in making their general physical examination at the hospital, found the patient's lungs in good condition. "Lungs negative. No dullness. No rales."

The patient was regularly examined, as to lungs, among other things, while in the hospital. No signs of tuberculosis were discovered. There was some trouble with the heart owing to the previous attacks of rheumatism.

Dr. Hawes, specialist in diseases of the lungs and tuberculosis for many years, and consultant for the Veterans' Bureau for ten years as to diseases of the lungs, and consultant at various Boston hospitals for some years, testified that he examined the plaintiff in April, 1924, and August, 1924, each time at the Naval Hospital at Chelsea. His findings were made in conjunction with other doctors who had previously made preliminary examinations and gathered up the history of the patient. X-ray pictures were made, and the examinations appear to have been scientific and complete. As to the first examination, the doctor testified from notes dictated at that time to a stenographer: "Well developed and nourished. Fat. I can find nothing wrong with the lungs. X-ray shows a remarkably normal chest. No evidence of tuberculosis in this case. Diagnosis: Chronic Bronchitis. Advise discharge to the out-patient department for further observation."

In the examination of August, 1924, he made the following record: "Well developed and nourished man. Poor resonances throughout entire chest. Expansion is very

limited but no abnormal dullness or changes in voice or throat sounds. X-ray shows remarkably normal chest. I believe that his symptoms and slight temperature are on an n. p. basis—neuro psychiatric—and suggest nose and throat examination by Dr. Heffernan."

The doctor testified that there was no evidence of tuberculosis at either of his examinations.

On cross-examination, reference being made to the fact that other doctors had advised hospitalization for tuberculosis, and asked whether he would say it was impossible that this man had tuberculosis when he examined him in 1924, he answered: "Yes. I should say so. I should say they were mistaken; that they wanted to give the man the benefit of sanitary treatment and the benefit of the rest that that would mean, as has been done in thousands of cases."

█ I should consider a man with active pulmonary tuberculosis totally disabled under the established definition of that term and the liberal construction that prevails. It is common knowledge that for such a man to work is dangerous to himself and others. Nicolay v. U. S. (C. C. A.) 51 F.(2d) 170; U. S. v. Rice (C. C. A.) 47 F.(2d) 749.

█ A case of latent tuberculosis, that is, the condition which is present without showing itself, is an entirely different matter. We are told that many people have such a condition and never know it. They are not totally disabled and often not disabled at all.

In this case, in order to find that the plaintiff was totally disabled on or before December 31, 1918, I must have evidence that he then had active tuberculosis.

The fact that he developed rheumatism in the service and became disabled by it is not sufficient and is not claimed to be. That is the basis of his demand for compensation for disablement which the government allowed. A sympathetic guess is not sufficient.

What do the doctors called by the plaintiff say about active tuberculosis in 1918? They give him the benefit of every doubt, and, properly so, I think, but I can find in their testimony no actual statement of opinion that the plaintiff had an active condition of tuberculosis in 1918.

The family doctor, consulted in 1918, expressed no opinion, not even a guess.

Dr. Anderson, in 1920, diagnosed pulmonary tuberculosis, and said it "probably could have existed in 1918," but specified it later as latent tuberculosis, saying, "I believe that he had a latent tuberculosis that gradually developed, that would be aggravated or increased in its intensity by some intercurrent disease."

In 1922 a doctor for the first time mentions active tuberculosis, which he also characterized as incipient. Dr. Nichols expressed the opinion that the plaintiff had tuberculosis in 1918, but he clearly referred to a possible latent condition only, because he negatived the suggestion of any tuberculosis bacilli being present in 1918, and on cross-examination he stated that at the time of his examination he could not state positively whether or not any tuberculosis was present.

Dr. Cummings, an X-ray specialist, finding in 1922 a condition in one lung suggestive of active tuberculosis, and in 1925 and 1931 no evidence of active tuberculosis, expressed no opinion whatever as to the condition in 1918.

If friendly and sympathetic doctors called by the plaintiff will not say that he had active tuberculosis in 1918, it is clear that I cannot do so.

To enable the plaintiff to recover on this insurance policy he must show not only that the disability was total in 1918, but that it was permanent. The disability claimed being tuberculosis, assuming that he had some form of it in 1918, from that point of time its permanency would be more or less a matter of speculation. From the point of view of thirteen years afterward we are not obliged to hazard a guess. Dr. Hawes, in 1924, first in April and then in August, found nothing wrong with the plaintiff's chest. Dr. Cummings, a witness called by the plaintiff, found no evidence of active tuberculosis in 1925 nor in 1931. So far as it appears in evidence, the plaintiff has not been examined between 1925 and 1931 nor since the latter date.

The above evidence goes uncontradicted. If the plaintiff ever had active tuberculosis that condition evidently has been either cured or has subsided.

The other conditions affecting the plaintiff's physical health, such as rheumatism, and the chronic bronchitis with which Dr. Hawes testified he is afflicted, are not the basis of any claims made under the insurance policy.

For the reasons above stated, it follows that judgment must be for the defendant.